# EXHIBIT A

STATE OF NORTH DAKOTA

COUNTY OF _____ McHenry ____

Larisa Dirkzwager _____

(Plaintiff)

                                    PLAINTIFF,

Vs

_Archer-Daniels-Midland Company___

(Defendant)

                                    DEFENDANT,

IN DISTRICT COURT

_Northeast_____ JUDICIAL DISTRICT

Case No. _25-2020-CV-84_

SUMMONS _____


THE STATE OF NORTH DAKOTA TO THE ABOVE NAMED DEFENDANT(S):

YOU ARE HEREBY SUMMONED and required to appear and defend against the COMPLAINT in this action, which is herewith served upon you, by serving upon the undersigned an Answer or other proper response within twenty (20) days after the service of this Summons and Petition upon you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

Dated this 22 day of October , 20 20

_Larisa Dirkzwager_____ , Plaintiff

Signature of Plaintiff

____Larisa Dirkzwager_____

Printed name of Plaintiff

____5869 49th Ave NE_____

(Address)

City of ___York_____, North Dakota ___58386_____

Phone Number: _____763-307-0342_____

STATE OF NORTH DAKOTA

COUNTY OF _____ McHenry _____

Larisa Dirkzwager _____                    )

(Plaintiff)                                     )

                                                )

                         PLAINTIFF,             )

Vs                                              )

_Archer-Daniels-Midland Company_____            )

(Defendant)                                     )

                         DEFENDANT,             )

IN DISTRICT COURT

_Northeast_____ JUDICIAL DISTRICT

Case No. _25 – 2020 – CV-84_

__COMPLAINT_____

Jury Trial demanded_____

Per se litigant_____

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION, RETALIATION, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Parties

**The Plaintiff**

Name                     Larisa Dirkzwager _____

Street Address           5869  49th Ave NE _____

City and County          York,  Benson _____

State and Zip code       North Dakota, 58386

Telephone Number ____ 763-307-0342 _____

E-mail Address           ld.quarterhorses@gondtc.com

**The Defendant**

Name                     Archer-Daniels-Midland Company _____

Street Address           1388 Highway ND-97

City and County          Velva,  McHenry

State and Zip code       North Dakota, 58790

Telephone Number ____ 701-338-2075

Page 1 of 9

## Jurisdiction

### Subject Matter Jurisdiction

1.  This action is brought for discrimination in employment pursuant to the North Dakota Human Rights Act (N.D.C.C. ch 14-02.4), (N.D.C.C. ch34-01-20), (N.D.C.C. ch34-01-17), (N.D.C.C. ch34-01-13), as amended; Title VII of the Civil Rights Act of 1964, as amended; Age Discrimination in Employment Act of 1967, as amended.

### Personal Jurisdiction

2.  Personal Jurisdiction requirements are met and Rule 4 of the North Dakota Rules of Civil Procedure; as the plaintiff is the United States citizen and resident of the state of North Dakota. Archer-Daniels-Midland Company is transacting the business in this state and maintaining a principal place of business in McHenry county of North Dakota state.

## Venue

3.  Venue is proper in this judicial district under North Dakota Century Code chapter 28-04; as Plaintiff was employed by the Archer-Daniels-Midland Company in the McHenry county at the time of her termination, plaintiff's employment records are maintained this judicial district, and decisions adverse to Plaintiff's employment that are the subject of this civil action were made in this judicial district.

## Statement of Claim

4.  I began working for the above-named Defendant on July 7, 2011, as a lab tech. Beginning on or about February 2013, and continuing till the end of my employment in June 2019, I was subjected to

repeated and persistent harassment based on my nation of origin (Russia) by co-workers, who made repeated  comments about me being Russian in relation to current events, such as the 2014 Russian conflict in the Crimea Peninsula, the foreign interference in the 2016 United States Presidential elections, and the 2017  Russian doping scandal at the Olympics.  I constantly heard comments such as, "When will you Russians will get out of Crimea?" and  "Did you use doping?"  and "It's Russians again!" and, whenever the lab computers were down, "Probably Russian hackers." "  In January 2019, she heard employee Jeff Nelson say to Roby Summers:  "F***ing immigrants. You'd think they come to pick strawberries. Next thing you know, they get all the good jobs from us."

5.    Also, during my employment, I was subjected to sexual harassment/harassment based on my sex (female) when co-workers would use harassing language such as sexual innuendo and double entendres.  For instance, in spring of 2017 I came to work the night shift, and all jugs for recycling were full.  Testing cannot be performed if there are no containers for leftover samples. According the standard operating procedure, I called the shift supervisor Andrew Schiele, and asked him to send a material handler to empty the jugs. He said that the material handler would come as soon as he finished another task. However, the material handler did not come, so I continued to call Andrew Schiele. Eventually, I heard on the plant radio, "Larisa wants somebody to take care of her jugs. Any volunteers? Who wants to take care of Larisa's jugs?"  When I was cleaning the grinding room, Roby Summers came in; Andrew Schiele rushed in after him. He did not know that I was there. He looked ecstatic. "Do you know what I said on the radio last night?" he said to Summers. "That Larisa wants somebody to take care of her jugs!"  I showed my presence. Andrew looked startled and ran out.

6.   In the spring of 2019, an employee from the maintenance department came to the lab to install the exhaust for plasma spectrometer. Alicia, Jeff Nelson, and myself gathered around to help. When he unpacked and examined the parts, he explained that he could not perform the task, because for proper assembly he needed the tubes with male-female connectors, but the available parts were both female. Then he manipulated the parts with his thumb and index finger in an overtly sexual manner. He gloated, watching as Alicia blushed. I felt extremely uncomfortable and offended. These types of comments and behavior continued until my discharge in June 2019.

7. I repeatedly reported that I was being harassed continually to the Defendant, beginning in January 2013,and continuing throughout my employment. In May 2017 it elevated into a big investigation. Greg Saloka, the labor representative from corporate headquarters, conducted it. Lab supervisor Anita Schmidt told me that I had "made a big mistake," but that I might be able to keep my job if I "don't rock the boat" and write a good voluntary statement that the situation in the laboratory was greatly improved after the investigation. At that moment, I believed that this was true. My co-workers became exaggeratedly polite. However, in actuality the harassing became covert. Soon after the investigation was concluded, the administration created new titles for the same job: Lab Tech1, Lab Tech 2, and Lab Tech 3. The new titles did not affect wages nor duties. The sole purpose was to label certain employees and then terminate them without accountability. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

8. When my colleagues discovered my age (I was born in 1966, but look somewhat younger), the information gave them a new reason to harass me. A co-worker, namely Robby Summers, rearranged the lab supplies, and then he and other co-workers watched me struggle to find equipment or chemicals. They would ask derisively, "What is that, a senior moment?" Robby Summers was especially blatant and cruel in his harassment. He altered, or directed to be altered, my lab data, and destroyed work records.  Lab samples were mislabeled. Summers would then declare to the other workers that I had early-onset dementia. The result was that I was constantly looked upon as less capable than my colleagues, and viewed as someone who needed extra supervision, even though my work was demonstrably well above average in all aspects.

9. In April 2019, despite an imminent lab-wide downsizing, a new employee was hired. The new hire was much younger than I am. I was training this employee in most lab duties. As soon as she was able to perform the functions which had been my responsibility, I was informed by the plant manager my position in the lab was eliminated. The new employee was doing precisely the job that I did, so the position was obviously not eliminated.  The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

10. In December 2018, I applied for the position of Quality Control Lab Supervisor. In April 2019, Robby Summers told me that he was the boss now. I had not received the official notification of my denial of promotion, or any notification that Summers was my supervisor. Summers was not on the list of my time card approvals, which is a lab supervisor responsibility. The position was given to a person less qualified in experience and relevant education. I believe I was not selected for the promotion due to my national origin, sex, age (53), and/or in retaliation for my complaints of harassment. I have a college degree, five years of experience as a Quality Control Laboratory supervisor in another biodiesel plant before my employment at ADM, and nearly eight years of experience at ADM with a perfect performance record. Robby Summers, the man who was given the Lab Supervisor position, has multiple arrests for enticing people in criminal activity, convictions for fraud, and has a known and documented history of violence and harassment. ADM rewarded him for this by promoting him to a supervisory position which exposes more women to his harassment. The position was kept open for six months, during which time Robby Summers repeatedly applied pressure on me to try to force me to quit. When ADM management realized that they could not break me, they terminated me. As far as I know, Summers was officially promoted only after I was terminated. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

11. Other ADM Processing employees of the plant were paid the night differential in their wages. I worked an above average number of nights, but never received the night differential pay. I never received the Sunday pay, though I worked nearly every weekend. In almost 8 years working at ADM, I only had one holiday off. I was often scheduled to work by myself on weekends and holidays, pulling double duty, though the next day four Lab Techs would be scheduled to do the same work that I was forced to do alone. One Christmas, I was stranded in the plant for three consecutive shifts. Nobody could relive me due a local blizzard and a "No travel advisory". However, I received only the holiday pay for one shift, and regular wages for the second Christmas shift. Also, I had worked 30 consecutive hours without relief or assistance. My lab supervisor explained to me that the computer system would not allow the entering of 30 hours in a row for any individual employee, but that headquarters would figure it out. It was never resolved, and I did not receive the pay.

13.   Whenever I went to the bathroom, Brenda Rudnick was only one step behind me. According to her, someone told her that I was stealing from the lockers. But there are no documented complaints of thefts from lockers. In December 2018, I heard Jessika Martin say to Anita Schmidt, "Larisa spent fifteen minutes on a phone in the locker room talking to her mother." Anita replied, "That's all? It's not enough."

14.   I have suffered personal harm because I was subjected to a hostile working environment and harassment based on my national origin and gender. I was also subjected to intentional infliction of emotional pain and mental anguish. I was not promoted due to national origin, sex, age, and/or in retaliation. I was discharged from employment in retaliation.

15.   ADM Processing is liable under Title VII for such harassment and discrimination because it knew, or should have known, of the harassment and discrimination but failed to take prompt and effective remedial action. Instead, it did just the opposite. It condoned, ratified, and otherwise allowed the harassing and discriminatory behavior and outrageous conduct continue.

16.   During my seven years at ADM Processing, Defendants created an environment which encouraged and fostered a hostile work environment for me due to my nationality of origin, age, gender. Such conduct was ongoing, open, and notorious. Simply put, gender, nationality of origin, and age discrimination are deeply embedded in ADM Processing. It is open, active, and unashamed. The harassment, abuse and discrimination are encouraged by ADM Processing management's refusal to stop the misbehavior.

17.   The hostile environment caused a rapid deterioration in my heath. I developed anxiety, nervous tics, sleep apnea, nightmares, and high blood pressure for which my physician prescribed

medication.

18.    My car tires were punctured so routinely that I carried an air tank in the vehicle at all times. Two doors of my car were dented. All of these incidents occurred on the ADM premises. One of several incidents of vandalism was particularly dangerous, putting me in harm's way. A punctured tire with a slow leak may be a little prank elsewhere, but in North Dakota during the winter, it can be a death sentence. Once I left the charger for my phone in the lab and it disappeared. I wasn't able to charge my phone. That same night, I was about 2 miles from my ranch when my tire went flat. The temperature was -10 degrees, and it was dark. I tried to call home to ask my husband to pick me up, because it was impossible to change the tire in these conditions. But the battery was dead in my cell phone. Nobody drives on our road after 9pm in the winter. I had no other choice but to walk the two miles. ADM did nothing to investigate the vandalism or hold accountable the person(s) who committed this reckless disregard for human safety.

19.    On or about June 14, 2019, I was discharged from employment. I believe I was discharged in retaliation for reporting harassment. As a result of my good faith complaints and opposition to gender and age discrimination and sexual harassment, the Defendant retaliated against me by subjecting me to stricter scrutiny than my co-workers, to demeaning and hostile treatment, to being assigned weekend and night shifts and holidays, and, ultimately, my termination. I was qualified for, applied for, and should have received a promotion, but was instead fired.

## Exhaustion of Federal Administrative Remedies

20.    I filed a charge with the North Dakota Department of Labor and Human Rights and Equal Employment Opportunity Commission on February 28, 2019. The copy of "Charge of Discrimination" is attached hereto as Exhibit "B". Determination and Notice of Rights (Right to Sue Letter) was issued on July 28, 2020, which I received on August 10st, 2020., a copy of which is attached hereto as Exhibit "A".

## Relief

21.   That as a direct result of the failure to take prompt and effective remedial action to put a stop on outrageous behavior by the Defendant, I suffered health problems. depression, hypertension to include but not limited to, mental anguish, emotional pain and suffering.

22.   Defendant has conducted itself intentionally, deliberately, willfully and in callous disregard of my rights. The defendant conducts as alleged above constitutes retaliation against me because I was engaged in activities protected by Title VII.

WHEREFORE: I respectfully request that this court enter judgment against the Defendant and provide following relief:

a) Award actual damages including appropriate amounts of back pay and front pay, and the money lost from failure to promote and medical expenses.

b) Award compensatory for age, sex, nationality of origin discrimination, retaliatory discharge, wrongful termination and hostile work environment,

c) Award costs and reasonable attorney fees (in a case if I find the attorney)

d) I claim monetary damages against the Defendant in an amount that exceeds the jurisdiction of the District Court of North Dakota, to be determined at trial, plus costs, and for any further relief that this Honorable Court determines necessary and appropriate.

## Certification and Closing

23. Under Federal Rule of Civil Procedure 11 by signing below, I certify to the best of my knowledge, information, and belief that the complaint: (1)is not being presented for an improper purpose, such as harass, cause unnecessary delay, or needlessly increase the cost of litigation, (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law:(3)

the factual contentions have evidentiary support or, if specifically, so identified, will likely have

evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the

complaint otherwise complies with requirements of Rull11.

Plaintiff demands jury trial of all issues.

Respectfully submitted

Dated this 22 day of October , 20 20 .

*Larisa Dirkzwager*

Signature

____Larisa Dirkzwager_____ (self-represented)_____

Printed Name

___5869 49th Ave NE _____

Address

___York, ND, 58386_____

City, State, Zip Code

___763-307-0342_____

Telephone Number

STATE OF NORTH DAKOTA                               IN DISTRICT COURT

COUNTY OF _____McHenry_____                              _Northeast_____ JUDICIAL DISTRICT

Larisa Dirkzwager_____                    )

(Plaintiff)                                     )          Case No. _____

                                               )

                              PLAINTIFF,        )          ___EXHIBIT_____

Vs                                             )

_Archer-Daniels-Midland Company_____           )          Jury Trial requested_____

(Defendant)                                    )

                              DEFENDANT,        )


### EXHIBIT  A

### DETERMINATION AND NOTICE OF RIGHTS


**Parties**

**The Plaintiff**

Name                    Larisa Dirkzwager_____

Street Address          5869  49th Ave NE_____

City and County         York,  Benson_____

State and Zip code      North Dakota, 58386

Telephone Number _____763-307-0342____

E-mail Address          ld.quarterhorses@gondtc.com


**The Defendant**

Name                    Archer-Daniels-Midland Company____

Street Address          1388 Highway ND-97_____

City and County         Velva,  McHenry_____

State and Zip code      North Dakota, 58790_____

Telephone Number _____701-338-2075_____

NORTH
## Dakota | Labor and Human Rights
Be Legendary.™

July 28, 2020

Larisa Dirkzwager
5869 49th Avenue NE
York, ND 58386

v.

Archer-Daniels-Midland Company
1388 Highway 97
Velva, ND 58790

Re:    NDDOLHR: NDE2006135
       EEOC: 32F-2020-00038

## DETERMINATION AND NOTICE OF RIGHTS

Under the authority of North Dakota Century Code (N.D.C.C.) chapter 14-02.4, as amended, the Age Discrimination in Employment Act of 1967, as amended, and Title VII of the Civil Rights Act of 1964, as amended, the North Dakota Department of Labor and Human Rights (Department) conducted an investigation and now issues the following determination as to the merits of the charge.

**Based upon an examination of the evidence and investigation into the allegations brought forth by the Charging Party, the Department:**

__X__    **is unable to conclude that a violation of applicable statutes has occurred.**
___      reasonably believes a violation of applicable statutes has occurred.
         other:

All jurisdictional requirements have been met, in that:

1. A complaint has been timely filed.
2. The Respondent is an employer within the meaning of the North Dakota Human Rights Act, as amended, the Age Discrimination in Employment Act of 1967, as amended, and Title VII of the Civil Rights Act of 1964, as amended.
3. Discrimination and retaliation in violation of the North Dakota Human Rights Act (N.D.C.C. chapter 14-02.4), as amended, the Age Discrimination in Employment Act of

Doug Burgum
GOVERNOR

Erica Thunder
COMMISSIONER

600 E Boulevard Ave Dept 406  |  Bismarck ND 58505  |  labor@nd.gov  |  www.nd.gov/labor
PHONE: 701-328-2660  |  TOLL FREE: 1-800-582-8032  |  ND RELAY TTY: 1-800-366-6888  |  VOICE: 1-800-366-6889  |  FAX: 701-328-2031

1967, as amended, and Title VII of the Civil Rights Act of 1964, as amended, is alleged by the Charging Party.

## I  SUMMARY OF CHARGE

The Charging Party, Larisa Dirkzwager, contacted the Department, a Fair Employment Practices Agency, and filed a charge of discrimination and retaliation on February 28, 2020.  The Charging Party alleges discrimination because of her age, national origin, and/or sex and retaliation, based on her participation in a protected activity.

In her charge, the Charging Party states the following:

*I [Larisa Dirkzwager, The Charging Party] began working for the above named Respondent [Archer-Daniels-Midland Company] on July 7, 2011 as a lab[oratory] tech[nician]. Beginning in or about February 2014, and continuing until the end of my employment in June 2019, I was subjected to continual harassment based on my national origin (Russian) by co-workers who made continual comments about me being Russian in relation to current events such as the 2014 Russian conflict in the Crimea Peninsula, [the] 2016 United States Presidential election, and the 2017 Russian doping scandal at the at the Olympics.*

*Also during my employment, I was subjected to sexual harassment/harassment based on my sex (female) when coworkers would use wards with double meanings such as "Larissa [Larisa Dirkzwager, The Charging Party] wants someone to take care of her jugs, any volunteers?", "[W]ho wants to take care of Larissa's jugs?", these comments continued until my discharge in June 2019.*

*I reported that I was being harassed continually to the Respondent, beginning in May 2017, and through my employment.*

*In December 2018, I applied for the position of Quality Control Lab[oratory] Supervisor. In April 2019, I was told I did not receive the promotion. I believe I was not selected for the promotion due to my national origin, sex, age (53) and/or in retaliation to my complaints of harassment.*

*On or about June 14, 2019, I was discharged from employment. I believe I was discharged in retaliation to me reporting harassment.*

*I was subjected to hostile working environment harassment based on my national origin and sex. I was subjected to hostile working environment sexual harassment, intentional infliction of emotional pain and mental anguish.  I was not promoted due to [my] national origin, sex, age, and/or in retaliation.  I was discharged from employment in retaliation [for my participation in a protected activity].*

## II  SUMMARY OF RESPONDENT'S RESPONSE

The Respondent denied the Charging Party's allegations of discrimination and retaliation and provided a written response, through its attorney, to the charge on April 13, 2020.  The response

states, in part:

*This letter and the attached documentation constitute the initial Position Statement of Archer-Daniels-Midland Company ("ADM" or "Company") [the Respondent] in response to the Charge of Discrimination ("Charge") filed by Larisa Dirkzwager [the Charging Party] in the above-referenced matter. The Company categorically denies Ms. Dirkzwager's claims of discrimination and harassment based on national origin, sex, and age, as well as her claim of retaliation. Because Ms. Dirkzwager's [Larisa Dirkzwager's, the Charging Party's] claims have no support in law or fact, the Charge should be dismissed in its entirety with a no probable cause determination.*

## I.     FACTUAL BACKGROUND

### A.  ADM and It's Commitment to Equal Opportunity and Non-Retaliation

*ADM is one of the world's largest agricultural and food ingredient providers. The Company is an agribusiness that transforms crops into products that serve the vital needs of a growing world. ADM's global headquarters are located in Chicago, Illinois.*

*As an Equal Opportunity Employer, ADM has adopted and consistently adheres to comprehensive policies that prohibit discrimination and harassment, which are disseminated and available to all employees. In relevant part, ADM's Anti-Discrimination and Harassment Policy set forth in its [E]mployee [H]andbook provides:*

> *As an Equal Opportunity Employer, ADM does not allow discrimination or harassment of employees or applicants based on race, color, religion, national origin, sex, age, disability, veteran status, sexual orientation or any other legally protected status.*

*(See **Exhibit A**, ADM Handbook Excerpts.) With respect to ADM's Equal Employment Opportunity Policy, the handbook further provides that ADM's "policy is to recruit, hire, train, promote and base all other employment decisions without regard to race, color, religion, national origin, sex, age, disability, veteran status, sexual orientation or any other legally protected status." (Id.) Additionally, ADM maintains an Open Door Policy, allowing its employees to take their work-related concerns to their Supervisor, Location Manager, or Human Resources Manager at any time. (Id.) ADM explicitly states that "[t]here will be **NO** penalty or discipline for an employee's good faith use of this procedure." (Id.) Ms. Dirkzwager first acknowledged receipt of these and other relevant policies on July 6, 2011. (See **Exhibit B**, Acknowledgment).*

### B.  Ms. Dirkzwager's Employment at ADM

### 1.  General Employment Background

*On or about July 6, 2011, ADM hired Ms. Dirkzwager to work as a Lab[oratory] Tech[nician] I at its location in Velva, North Dakota. (See **Exhibit C**, New Hire Form). During the course of her employment, Ms. Dirkzwager was ultimately promoted to [a] Lab Tech III.*

3

*While employed at ADM, Ms. Dirkzwager worked with a group of between five [(5)] and eight [(8)] other Lab Techs. Additionally, during the time period relevant to the Charge, she reported to Lab[oratory] Supervisor Anita Schmidt and Plant Manager Tim Bourdeau.*

### 2. Ms. Dirkzwager Makes a Complaint and ADM Completes a Thorough Investigation – May/June 2017

*On or about May 18, 2017, Ms. Dirkzwager complained to Ms. Schmidt [Anita Schmidt, Lab Supervisor] that she believed her Lab Tech coworkers were against her, and that they were making too many jokes and comments about Russia. She also notified Ms. Schmidt that she had been surreptitiously recording her coworkers' conversations in the lab. On the following day, Ms. Schmidt notified ADM Human Resources and held a meeting with all of the Lab Techs, including Ms. Dirkzwager. In relevant part, Ms. Schmidt advised the Lab Techs that harassment, discrimination, and secret recordings were strictly prohibited in the lab. She also required every Lab Tech to re-read and sign the ADM Code of Conduct prohibiting such behavior. (See **Exhibit D**, Signed Code of Conduct).*

*Between May 28, 2017 and May 30, 2017, Ms. Schmidt learned from multiple Lab Techs that Ms. Dirkzwager had continued to record employee conversations in the lab. On or about May 30, 2017, Ms. Schmidt and Mr. Bourdeau [Tim Bordeau, Plant Manager] met with Ms. Dirkzwager to again prohibit her from surreptitious recording at work. At that time, Ms. Dirkzwager reiterated her complaint that other Lab Techs—particularly Robby Summers—were "out to get her." She further stated that she feared Mr. Summers would become Lab Supervisor after Ms. Schmidt retired, and that if ADM did not prevent that, including by canceling Mr. Summers' upcoming training, she would file a lawsuit.*

*Immediately thereafter, in June 2017, ADM conducted a thorough investigation into Ms. Dirkzwager's complaint. As part of the investigation, ADM asked Ms. Dirkzwager to detail all of her concerns in writing, which she did on June 7, 2017. (See **Exhibit E**, Voluntary Statement Form). Therein, Ms. Dirkzwager outlined her fear that Mr. Summers would be the next Lab Supervisor and would ultimately terminate her employment, her poor working relationship with Mr. Summers, and her concerns with employee jokes and comments about the Russian Olympic Team and Russia's involvement in the 2016 U[nited] S[tates] Election. Id. She also noted that after raising her complaint with management the situation had greatly improved. Id. ("[N]ow when I can see how greatly the situation at the plant improved since I talked to [Anita Schmidt, Lab Supervisor], I wish I did it a long time ago."). Notably, Ms. Dirkzwager's complaint did not raise any concerns regarding age discrimination, sex discrimination, or retaliation as alleged in the Charge.*

*As part of the continuing investigation, Ms. Schmidt and Mr. Bourdeau also interviewed four [(4)] of the other Lab Techs including Mr. Summers. Again, no one reported any concerns regarding discrimination or retaliation as alleged in the Charge. Rather, the problem was generally characterized [as] a poor working relationship between two [(2)] "head-strong" individuals— Ms. Dirkzwager and Mr. Summers.*

*On June 30, 2017, Ms. Dirkzwager and Mr. Summers were notified that the employment*

4

*investigation had been completed. (See **Exhibit F** and **Exhibit G**, Investigation Memos). In part, the written notices provided that Mr. Summers had no authority to discipline, hire, or fire anyone (including Ms. Dirkzwager); that secret recordings at the ADM Velva facility were prohibited; and that both individuals must follow the ADM Code of Conduct (including no discrimination or harassment). Id. The notices also advised that any future issues should be brought to the attention of Ms. Schmidt, Mr. Bourdeau, or Human Resources. Id. Thereafter, ADM did not receive any further complaints from Ms. Dirkzwager until the present Charge.*

### 3. Ms. Dirkzwager's Employment at ADM is Terminated as Part of a Company-Wide Reduction in Force

*On June 14, 2019, ADM terminated Ms. Dirkzwager's employment as part of a Company-wide reduction in force ("RIF"). (See **Exhibit H**, RIF Letter). As noted in the RIF materials provided to Ms. Dirkzwager, her selection for termination was based solely on legitimate, non-discriminatory business needs:*

> *[W]e [Archer-Daniels-Midland Company, The Respondent] unfortunately need to inform you [Larisa Dirkzwager, the Charging Party] today that certain positions, including your current role, are being impacted. <u>Please know that this decision is in no way a reflection of our many talented colleagues and their efforts each and every day; rather, it is a function of the broader changes we are making to the global ADM organization.</u>*

*Id. (Emphasis in original). As part of the RIF, Ms. Dirkzwager was offered a generous severance package, including two [(2)] weeks' salary ($12,926) and other continued benefits, but she declined the Company's offer. To date, ADM has not hired a replacement to fill Ms. Dirkzwager's position.*

## II.   LEGAL ANALYSIS

### A. Ms. Dirkzwager's Hostile Work Environment Claims Fail as a Matter of Law

*Ms. Dirkzwager's Charge alleges that she was subjected to hostile work environment harassment based upon her national origin (Russian) and gender (female). Specifically, Ms. Dirkzwager alleges that her coworkers made comments about Russia's involvement in current events, including the 2014 conflict in Crimea, the 2016 U.S. Presidential election, and the 2017 Olympic doping scandal. She further claims that her coworkers used double entendre, such as "who wants to take care of Larisa's jugs?" in order to sexually harass her.*

*As an initial matter, North Dakota law does not recognize a claim for hostile work environment harassment based upon national origin. As such, this portion of the Charge should be summarily dismissed. Assuming arguendo, however, that both national origin and sex provide a basis for a hostile work environment harassment claim, which ADM denies, Ms. Dirkzwager's initial burden of establishing a prima facie case requires proof of five [(5)] elements: "(1) the employee belongs to a protected class; (2) the employee was subject to unwelcome sexual [or national origin] harassment; (3) the harassment was based on sex [or national origin]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known*

*of the harassment and failed to take proper remedial action." Opp v. Source One Mgmt., Inc. 591 N.W.2d 101, 106 (N.D. 1999).*

### *1. Ms. Dirkzwager's National Origin Harassment Claim Fails*

*Ms. Dirkzwager's claim alleging hostile work environment harassment based upon her national origin fails for a multitude of reasons. To begin, the Charge is untimely. Specifically, the law requires an employee alleging discrimination to file his or her claim "within three hundred days of the alleged act of wrongdoing." N.D.C.C. § 14-02.4-19. Here, Ms. Dirkzwager complains about events (or comments/jokes related thereto) that occurred in 2014, 2016, and 2017. Because these events occurred many <u>years</u> before the present Charge, the Charge is untimely and must be dismissed.*

*The national origin hostile work environment claim fails for several additional reasons. First, the alleged harassment did not affect a term, condition, or privilege of Ms. Dirkzwager's employment. In order to establish this element, Ms. Dirkzwager must "prove the conduct complained of is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Hysjulien v. Hill Top Home of Comfort, Inc., 827 N.W.2d 533, 544–45 (N.D. 2013) (citations omitted). Additionally, "[t]o be actionable, [she] must show [] her work environment is both objectively and subjectively offensive, essentially one that a reasonable person would find hostile or abusive." Id. Title VII [of the Civil Rights Act of 1964, as amended] and the North Dakota Human Rights Act[, as amended] are "not a general civility code, and ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing will generally not rise to the level of actionable harassment." Id. Here, Ms. Dirkzwager has not met her burden. Comments or jokes about Russian news events, even if directed at Ms. Dirkzwager—which she cannot prove—simply do not rise to the level of actionable hostile work environment harassment.*

*Finally, Ms. Dirkzwager also cannot meet her burden of establishing that ADM failed to take proper remedial action regarding her claims of national origin harassment. Indeed, the Company thoroughly investigated and resolved her singular complaint on this topic in May/June 2017, and she made no further complaint or claim thereafter until the present Charge. In light of the foregoing, Ms. Dirkzwager's national origin hostile work environment harassment claim should be dismissed.*

### *2. Ms. Dirkzwager's Sexual Harassment Claim Fails*

*Ms. Dirkzwager's claim alleging hostile work environment harassment based upon her sex also fails for a variety of reasons. To begin, as outlined above, Ms. Dirkzwager never complained of sexual harassment during her eight [(8)] years of employment with ADM. As such, she cannot meet her prima facie burden of establishing that ADM knew or should have known of the harassment and failed to take proper remedial action. Additionally, Ms. Dirkzwager presents no evidence to establish that her coworkers actually harassed her with use of double entendre, a claim ADM denies. However, even if such comments had occurred, they would not rise to the level of actionable harassment. Indeed, the comments Ms. Dirkzwager complains of may well have been misunderstood (given the nature of double entendre), and, at most, they would qualify as a gender-related joke that*

is not severe or pervasive and does not objectively and subjectively make the workplace hostile and abusive. As such, Ms. Dirkzwager's hostile work environment harassment claim based upon sex should also be dismissed.

### B.    Ms. Dirkzwager's Failure to Promote Claim Fails as a Matter of Law

Ms. Dirkzwager's Charge also alleges that she was not promoted because of her national original, sex, age, and in retaliation for her prior complaints. Specifically, Ms. Dirkzwager alleges she applied for the position of Quality Control Lab Supervisor in December of 2018 and was notified that she did not receive the promotion in April 2019. As outlined below, this clam fails for numerous reasons.

In order for Ms. Dirkzwager "[t]o establish a prima facie case in a failure-to-promote case, [she] must show: (1) that she was a member of a protected group; (2) that she was qualified and applied for a promotion to an available position; (3) that she was rejected; and (4) that a similarly qualified employee, not part of a protected group, was promoted instead." Koehler v. Cty. of Grand Forks, 658 N.W.2d 741, 746 (N.D. 2003). If she can meet her prima facie burden, ADM must prove it had "legitimate, nondiscriminatory reasons" for its employment decisions. Schweigert v. Provident Life Ins. Co., a Div. of United Servs. Life Ins. Co. (USLICO), 503 N.W.2d 225, 229 (N.D. 1993).

Here, Ms. Dirkzwager's failure to promote claim fails for several reasons. First, this claim is again untimely. As stated above, the law requires this discrimination claim to be filed "within three hundred days of the alleged act of wrongdoing." N.D.C.C. § 14-02.4-19. Here, Ms. Dirkzwager alleges she was rejected for a promotion in April 2019. Even assuming she means the last day of April 2019 (i.e. April 30th [2019]), more than 300 days passed before she filed the present Charge on February 28, 2020 (304 days). As such, this portion of the Charge should be summarily dismissed. Moreover, Ms. Dirkzwager's failure to promote claim fails for the additional reason that she has not properly alleged that she was qualified for the position she applied for. Nor has she properly alleged that a similarly qualified employee who was not part of her protected group received the promotion. Finally, even if Ms. Dirkzwager had appropriately brought this claim, ADM affirmatively asserts that all of its hiring and promotional decisions are made for legitimate, nondiscriminatory business reasons. As such, Ms. Dirkzwager's failure to promote claim should be dismissed.

### C.    Ms. Dirkzwager's Retaliation Claim Fails as a Matter of Law

Ms. Dirkzwager's Charge lastly alleges that her employment at ADM was terminated on the basis of retaliation. To establish a prima facie case of retaliatory discharge, Ms. Dirkzwager must establish that she "(1) opposed an unlawful employment practice, (2) the employer took adverse employment action, and (3) a causal connection exists between the adverse employment action and the protected activity." Opp v. Source One Mgmt., Inc., 591 N.W.2d at 108. If she can meet her prima facie burden, ADM must then rebut the claim by advancing a legitimate, non-retaliatory reason for its action. Id. Ms. Dirkzwager's retaliation claim fails for several reasons. First, it's not clear what unlawful employment practice she claims to have opposed, or what action she allegedly took that forms the basis for her claim. Moreover, assuming arguendo that Ms. Dirkzwager opposed an unlawful employment practice, which ADM denies, there is no causal connection between her action and her eventual employment termination. Specifically, assuming

*Ms. Dirkzwager alleges her employment was terminated because of her complaints in May/June 2017, she has not done enough to appropriately infer/establish causation. See e.g. Anderson v. Meyer Broad. Co., 630 N.W.2d 46, 55 (N.D. 2001) ("[Plaintiff] asks us, in effect, to draw an inference of causation from the mere fact that she reported violations and was subsequently fired. While, in an appropriate situation, circumstantial evidence may provide an inference of causation, there must be something more than pure speculation or conjecture."). Moreover, over two [(2)] years passed between Ms. Dirkzwager's complaint and her eventual employment termination. This fact weighs heavily against causation. Id. (Delay of a year between protected activity and termination did not support inference that termination was cause by protected activity). Finally, Ms. Dirkzwager's retaliation claim fails for the additional reason that ADM had a legitimate, non-discriminatory business justification for her employment termination. Namely, as outlined above, she was terminated as part of a Company-wide RIF. In light of the foregoing, Ms. Dirkzwager's retaliation claim should also be dismissed.*

### III. CONCLUSION

*For the foregoing reasons, ADM respectfully requests that the Charge be dismissed in its entirety with a no probable cause determination. If you would like any additional information or to discuss this matter further, please contact me directly.*

### III   JURISDICTION

A. TIMELINESS: The subject charge was filed during the applicable statutes of limitations. The date of most recent harm was indicated to be June 14, 2019. The Charging Party's signed Form 5 was returned to the North Dakota Department of Labor and Human Rights on February 28, 2020. The charge was served on the Respondent in a timely manner.

B. NUMBER OF EMPLOYEES: The Respondent is a non-profit corporation in the state of North Dakota and employed over 20 employees, during the relevant period.

C. ALLEGATION: Discrimination and retaliation in violation of the North Dakota Human Rights Act, as amended (N.D.C.C. chapter 14-02.4), the Age Discrimination in Employment Act of 1967, as amended, and Title VII of the Civil Rights Act of 1964, as amended, is alleged by the Charging Party.

### IV   INVESTIGATIVE PROCEDURE

In order to find a violation of anti-discrimination law, the Charging Party must first establish a prima facie case. If the Charging Party establishes a prima facie case, the burden then shifts to the Respondent to present a credible reason for its actions. To be credible, the Respondent's response must offer a legitimate and believable, business-related, non-discriminatory reason for its actions.

1. If the fact finder determines the Respondent has shown a credible reason for its actions, the burden then shifts back to the Charging Party. The Charging Party must then convince the fact finder that the Respondent's response is not credible – that it is pretext. Upon a showing of pretext, the Charging Party must show that the Respondent's actions were

8

actually or can be inferred to be, in whole or in part, because of the Charging Party's protected status.

2. If the fact finder determines that the Respondent's reasons for its actions are NOT credible, s/he may draw an inference of discrimination. However, the Charging Party may still be required to show that the Respondent's actions were ultimately based, in whole or in part, on the Charging Party's protected status.

## V   INVESTIGATIVE FINDINGS AND ANALYSIS

The Department interviewed the Charging Party, and reviewed documents and statements. Based on the information gathered, the Department finds probable cause does not exist to believe the Charging Party was discriminated against on the basis of her age, national origin and/or sex and retaliated against because of her participation in a protected actuvity. In this case the issues of *hostile working environment* and *failure to promote,* under the basis of age, national origin, and/or sex, *sexual harassment,* under the basis of sex, *discharge,* under the basis of age and/or national origin,  and *failure to promote* and *discharge,* under the basis of retaliation, are addressed.

***Basis:***      ***Age, National Origin, and/or Sex***
***Issue:***      ***Hostile Working Environment Harassment***

In order to find a violation in the issue of *hostile working environment harassment* under the age, national origin, and/or sex provisions of state and/or federal law, the Charging Party must first establish discriminatory motive by direct evidence or a showing of a prima facie case. Because there is no direct evidence or the direct evidence provided in this case is questionable or disputed, the Charging Party must show:

1. that she belongs to a protected group(s);
2. that she was subjected to unwelcome harassment (slurs, epithets, or other hostilities, etc.);
3. that the harassment was based on the protected groups and;
4. that the harassment complained of affects a term, condition, or privilege of employment and is so pervasive as to alter the working conditions of employment and create an abusive working environment; and
5. that the employer knew or should have known of the harassment and failed to take proper remedial action.

With regard to the fourth element, unless the conduct alleged is quite severe, a single incident or isolated incidents of offensive conduct or remarks generally do not create an abusive environment. The mere utterance of an ethnic or racial epithet, which creates offensive feelings in an employee, would not affect the conditions of employment to a sufficiently significant degree to violate the Acts.

A "hostile environment" claim generally requires a showing of a pattern of offensive conduct. For harassment to be a violation, it must be sufficiently severe or pervasive enough to alter the conditions of the Charging Party's employment and create an abusive working environment. Since "hostile environment" harassment takes a variety of forms, many factors may affect this

determination. But in determining whether unwelcome conduct rises to the level of a "hostile environment" in violation of the Acts, the central inquiry is whether the conduct unreasonably interferes with the Charging Party's work performance or creates "an intimidating, hostile, or offensive working environment." Thus, incidents that are trivial or merely annoying do not establish a hostile environment that is actionable under the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil Rights Act of 1964, as amended, or the North Dakota Human Rights Act, as amended.

With regard to the first element of prima facie, the Charging Party was 53 years old during the relevant time period, she is of Russian national origin and is a female. The Respondent does not dispute knowledge of the Charging Party's age, national origin, and sex.

Concerning the remaining elements, the Charging Party stated when she could not find what she was looking for, Robby Summers, Laboratory Technician, asked her if she had a "senior moment" and, on one (1) occasion, he said, "It is probable dementia."

Regarding the incidents of hostile working environment harassment, based on national origin, the Charging Party alleges her co-workers made continual comments about her being Russian, in relation to current events such as the 2014 Russian conflict in the Crimea Peninsula, the 2016 United States Presidential election, and the 2017 Russian doping scandal at the at the Olympics.

Specifically, the Charging Party also alleges her co-workers made comments such as:

- Russians occupied Crimea and Ukraine;
- When are the Russians getting out?;
- So, Russian again?;
- It is Russians again!;
- Probably Russians (when computers were down);
- All Russians use doping;
- Did you use doping?; and
- These immigrants. You'd think they come to pick up strawberries. Next thing you know they get all good jobs from us.

According to the Charging Party, the comments were mostly made by Robby Summers, Laboratory Technician. The Charging Party stated Mr. Summers made the comments in "a joking manner."

The Charging Party did not allege any incidents of hostile working environment harassment, specifically related to her sex.

The Charging Party alleges the last time any such comment was made, related to either her age or her national origin, was in the "summer of 2018;" however, she could not state the date or approximate date. The Charging Party also alleges in May 2017, she complained about these comments and the Respondent conducted an investigation.

The Respondent stated on or about May 18, 2017, the Charging Party complained to Laboratory Supervisor, Anita Schmidt, that she believed her co-workers were "against" her and that they were making too many jokes and comments about Russia. The Respondent also stated the Charging Party

informed Ms. Schmidt she was recording her co-worker's conversations. According to the Respondent, the following day, Ms. Schmidt notified the Respondent's Human Resources office of the Charging Party's complaint and held a meeting with all of the Laboratory Technicians, including the Charging Party, during which Ms. Schmidt advised all of the employees that harassment, discrimination, and secret recordings, were strictly prohibited in the laboratory. The Respondent stated Ms. Schmidt also required every Laboratory Technician to re-read and sign the Respondent's Code of Conduct, prohibiting such behavior.

The Respondent also stated on or about May 30, 2017, Ms. Schmidt and Plant Manager Tim Bourdeau, met with the Charging Party at which time, the Charging Party reiterated her complaint that other Laboratory Technicians—particularly Robby Summers—were "out to get her" and said she feared Mr. Summers would become the Laboratory Supervisor, after Ms. Schmidt retired. According to the Respondent, the Charging Party also said if the Respondent did not prevent Mr. Summers from becoming a supervisor, including canceling Mr. Summers' upcoming training, she would file a lawsuit against the Respondent.

The Respondent stated immediately thereafter, in June 2017, it conducted a thorough investigation into the Charging Party's complaint and asked the Charging Party to detail all of her concerns in writing, which she did on June 7, 2017.

The evidence shows in the Charging Party's written statement dated June 7, 2017, she noted after raising her complaint with management, the situation had "greatly improved;" however, she expressed her fear Mr. Summers would become the next Laboratory Supervisor and would ultimately terminate her employment. The evidence also shows on June 30, 2017, the Respondent issued a written warning to Mr. Summers and advised Mr. Summers he was not a supervisor, a lead, nor did he have any authority above any other Laboratory Technician, and he had no authority to discipline, hire, or fire anyone.

The Charging Party stated the employees refrained from making derogatory comments for a while; however, the harassment continued in 2018. The Charging Party stated on one (1) occasion in 2018, she fixed a loose wire and Mr. Summers made the comment, "Oh, it works again! Larisa [Larisa Dirkzwager, the Charging Party] fixed it the Russian way!" The Charging Party also stated on another occasion, date unknown, she wrote down her work schedule and reported to work, according to the schedule, only to be told she was not scheduled to work.

According to the Charging Party, when she worked night shifts, she found other employees who had worked day shifts had not taken the garbage out, had not disposed of items in recycling bin, and/or had not restocked chemicals. The Charging Party alleges an employee made a statement, over the radio, something to the effect of: "The lab is not doing its job." The Charging Party also alleges her car was vandalized, in the Respondent's parking lot. According to the Charging Party, the last time any such incident occurred was in 2018.

The Charging Party stated she complained again, on March 21, 2019, when she submitted a letter, via email, to the Respondent. The Charging Party provided a copy of the March 21, 2019 letter; however, she stated she no longer has a copy of the email she sent to the Respondent. The Charging Party also stated the Respondent never responded to her letter.

The evidence demonstrates in her letter, the Charging Party stated the current supervisor was planning to retire in April 2019, and Mr. Summers, Laboratory Technician, was already acting as a supervisor. The evidence also demonstrates the Charging Party wrote she feared "the lab will once again be an unbearably hostile workplace." The evidence shows the Charging Party also wrote Mr. Summers had engaged in some criminal activities and, by promoting Mr. Summers, the Respondent would be showing "a disregard for the well-being and morale of ADM's [Archer-Daniels-Midland Company's, the Respondent's] educated, law-abiding personnel."

The Respondent denied receiving the Charging Party's March 21, 2019 letter. The Respondent stated even if the Charging Party did submit the letter, she only complained about the possible promotion of Mr. Summers and not the alleged incidents of hostile working environment harassment, based on any protected category.

The Charging Party admitted she did not complain about any incidents of hostile working environment harassment, which occurred after the Respondent's 2017 investigation and her March 21, 2019. The Charging Party alleges when, in 2017, she complained to her supervisor, Anita Schmidt, about the comments related to current events and Russians, Ms. Schmidt told her if she (the Charging Party) wanted to continue her employment she "should not rock the boat."

Ms. Schmidt denied any recollection of the alleged statement.

Even if the Charging Party sent her March 21, 2019 letter to the Respondent, the Charging Party admitted the last alleged incident of hostile working environment harassment, occurred in October 2018. Therefore, the Charging Party's allegations are not timely. The evidence shows none of the alleged incidents, occurred within the 300-day statute of limitations. In addition, the evidence does not show the Charging Party informed the Respondent of any additional incidents of unwelcome harassment, based on any protected category, which occurred after the Respondent conducted its investigation in 2017 and took remedial action.

In addition, even if all of the alleged incidents of hostile working environment harassment, based on her age and/or national origin occurred and were timely, the charge would still fail. The evidence does not show the alleged incidents of harassment either occurred or rose to the level of hostile working environment harassment, which is actionable under the applicable statutes. The evidence also does not show the alleged incidents of harassment affected a term, condition, or privilege of employment. As such, a finding of hostile working environment harassment is not warranted.

Considering the evidence as a whole, we find that the Charging Party was not subjected to hostile working environment harassment, based on her age, national origin, and/or sex, which is actionable under the applicable statutes.

*Basis:*      *Sex*
*Issue:*      ***Sexual Harassment*** Hostile working environment: When an employer creates or
              condones an environment at the workplace, which significantly affects an employee
              because of his or her sex, regardless of any job detriment.

12

In order to find a violation in the issue of *hostile working environment sexual harassment* under the sex provisions of state and/or federal law, the Charging Party must first establish discriminatory motive by direct evidence or a showing of a prima facie case. Because there is no direct evidence or the direct evidence provided in this case is questionable or disputed, the Charging Party must show:

1. that she belongs to a protected group;
2. that she was subjected to unwelcome sexual harassment;
3. that the harassment complained of is based upon sex;
4. that the sexual harassment complained of affects a term, condition, or privilege of employment and is so pervasive as to alter the working conditions of employment and create an abusive working environment; and
5. that the employer knew of should have known of the harassment and failed to take proper remedial action.

With regard to the fourth element, unless the conduct alleged is quite severe, a single incident or isolated incidents of offensive conduct or remarks generally do not create an abusive environment. The mere utterance of an epithet, which creates offensive feelings in an employee, would not affect the conditions of employment to a sufficiently significant degree to violate the Acts.

A "hostile environment" claim generally requires a showing of a pattern of offensive conduct. For harassment to be a violation, it must be sufficiently severe or pervasive enough to alter the conditions of the Charging Party's employment and create an abusive working environment. Since "hostile environment" harassment takes a variety of forms, many factors may affect this determination. But in determining whether unwelcome conduct rises to the level of a "hostile environment" in violation of the Act, the central inquiry is whether the conduct unreasonably interferes with the Charging Party's work performance or creates "an intimidating, hostile, or offensive working environment." Thus, incidents that are trivial or merely annoying do not establish a hostile environment that is actionable under Title VII of the Civil Rights Act of 1964, as amended, and/or the North Dakota Human Rights Act (NDHRA), as amended.

Regarding the first element, there is no dispute the Charging Party is a female and the Respondent had knowledge of her sex. As such, the first element has been established.

Concerning the remaining elements, the Charging Party alleges a co-worker made comments on the radio, such as: "Larisa [Larisa Dirkzwager, The Charging Party] wants someone to take care of her jugs, any volunteers?," and "Who wants to take care of Larisa's jugs?" The Charging Party also alleges the comments were made in the summer of 2017.

The evidence shows the Charging Party's allegation of sexual harassment, is not timely. The evidence also shows even if the alleged incident of sexual harassment occurred, it occurred more than 300 days, prior to the Charging Party filing of her charge of discrimination and retaliation, on February 28, 2020.

In addition, the evidence demonstrates the isolated incident would not rise to the level of sexual

harassment, that is actionable under Title VII of the Civil Rights Act of 1964, as amended, and/or the NDHRA, as amended. The evidence does not demonstrate the alleged incident of sexual harassment was sufficiently severe or pervasive enough to alter the conditions of the Charging Party's employment and create an abusive working environment. The evidence also does not demonstrate the Respondent was aware of the alleged incident of sexual harassment and had no opportunity to take any remedial action. As such, a finding of hostile working environment sexual harassment, under the applicable statutes, is not warranted.

Considering the evidence as a whole, we find the Charging Party was not subjected to hostile working environment sexual harassment, actionable under the applicable statutes.

**Basis:**   ***Age, National Origin, and/or Sex***
**Issue:**   ***Failure to Promote***

In order to find a violation in the issue of *failure to promote* under the age, national origin, and/or sex provisions of state and/or federal law, the Charging Party must first establish discriminatory motive by direct evidence or a showing of a prima facie case. Because there is no direct evidence or the direct evidence provided in this case is questionable or disputed, the Charging Party must show:

1. that she belongs to a protected group(s);
2. that she was a qualified applicant for promotion;
3. that she was unsuccessful application for an existing vacancy, and
4. that, after her rejection, the position was filled by someone outside the Charging Party's protected group, or that the position remained open and the Respondent continued to seek qualified applicants.

With regard to the first element of prima facie, the Charging Party was 53 years old during the relevant time period, she is of Russian national origin and is a female. The Respondent does not dispute knowledge of the Charging Party's age, national origin, and sex.

Concerning the remaining elements, the Charging Party alleges in December 2018, she applied for the Laboratory Supervisor position and met the required job qualifications. The Charging Party also alleges in April 2019, she learned the position was offered to Robby Summers, a Laboratory Technician. According to the Charging Party, the Respondent did not formally announce Mr. Summers' promotion; however, the previous supervisor retired on April 1, 2019, at which time Mr. Summers assumed supervisory duties. The Charging Party stated she became aware of Mr. Summer's promotion on or about April 15, 2019.

The evidence shows the Charging Party's allegation related to failure to promote is not timely. The evidence also shows the Charging Party filed her charge of discrimination and retaliation on February 28, 2020, more than 300 days following the alleged discriminatory harm. As such, the issue will not be further addressed.

Even if the Charging Party were able to establish a prima facie case, the issue would still fail. The evidence demonstrates no employee, under the age of 40, applied or expressed an interest for the promotion. The evidence also demonstrates, in addition to the Charging Party and Mr. Summers,

14

two (2) employees, both males, ages 47 and 53, applied for the promotion. The Respondent stated it does not maintain information regarding employee's national origins; however, it is reasonable to assume at least one (1) of the two (2) applicants, who were also rejected for the promotion, is not of the same national origin as the Charging Party. In addition, there is no evidence which shows the Respondent's policies and/or practices, related to promotions, consider an employee's age, national origin, and/or sex.

Considering the evidence as a whole, we find the Charging Party was not promoted, for reasons unrelated to her age, national origin, and/or sex.

| | |
|---|---|
| ***Basis:*** | ***Retaliation*** |
| ***Issue:*** | ***Failure to Promote*** |

In order to find a violation in the issue of *failure to promote* under the retaliation provisions of state and/or federal law, the Charging Party must first establish discriminatory motive by direct evidence or a showing of a prima facie case. Because there is no direct evidence or the direct evidence provided in this case is questionable or disputed, the Charging Party must show:

1. that she opposed a practice made unlawful by one of the employment discrimination statutes or that she engaged in a protected activity in that he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, hearing, or litigation under federal, or state laws,
2. that she suffered adverse action by the employer subsequent to or contemporaneous with such protected activity, and
3. that there exists a causal connection between such activity and the employer's action (e.g., there is direct evidence of retaliation or the action followed the protected activity so closely as to justify an inference of retaliatory motive).

Concering the first element, there is no dispute the Charging Party participated in protected activities in May 2017 and June 2017, when she complained about her co-workers making jokes and comments about Russia and about her being Russian, including her participatiion in the Respondent's investigation into the Charging Party's allegations.

The Charging Party alleges she also participated in a protected activity on March 21, 2019, when she emailed her letter of complaint to the Respondent.

The evidence shows in her letter, the Charging Party complained about Robby Summers, Laboratory Technician, already acting as a supervisor and fearing "the lab will once again be an unbearably hostile workplace." The evidence also shows the Charging Party wrote Mr. Summers had engaged in some criminal activities and, by promoting Mr. Summers, the Respondent would be showing "a disregard for the well-being and morale of ADM's [Archer-Daniels-Midland Company's, the Respondent's] educated, law-abiding personnel."

The Respondent denied receiving the Charging Party's March 21, 2019 letter. The Respondent also stated even if the Charging Party did submit the letter, she only complained about the possible promotion of Mr. Summers and not the alleged incidents of hostile working environment

harassment, based on any protected category.

The evidence does not demonstrate the Charging Party participated in a protected activity on March 21, 2019. The evidence shows the Charging Party simply complained about Mr. Summers acting as if he was already a supervisor and informing the Respondent of her opinion that Mr. Summers should not be promoted.

Based on the evidence, we find the Charging Party participated in protected activties in May 2017 and June 2017, when she complained her co-workers had made comments, based on her national origin, and participated in the Respondent's investigation into the Charging Party's allegations. As such, we also find the first element has been established.

Regarding the second element, the Charging Party alleges she was not promoted to a Laboratory Supervisor position, which she applied for, in December 2018. The Charging Party stated she became aware of Mr. Summers' promotion on or about April 15, 2019.

The evidence shows the Charging Party's allegation is not timely. The evidence also shows the Charging Party filed her charge of discrimination on February 28, 2020, more than 300 days following the alleged discriminatory harm. As such, the issue will not be further addressed.

Even of the Charging Party's allegation was timely, the issue would still fail as the alleged retaliatory harm occurred almost two (2) years later following her participation in a protected activity. In addition, the evidence shows the other applicants, who did not participate in a protected activity, were also rejected for the promotion.

Considering the evidence as a whole, we find the Charging Party was not denied a promotion, for reasons related to her participation in protected activities.

**Basis:**        *Age and/or National Origin*
**Issue:**        *Discharge*

In order to find a violation in the issue of *discharge* under the age and/or national origin provisions of state and/or federal laws, the Charging Party must first establish discriminatory motive by direct evidence or a showing of a prima facie case. Because there is no direct evidence or the direct evidence provided in this case is questionable or disputed, the Charging Party must show:

1. she belongs to a protected group(s);
2. she was qualified for and performing her job in a satisfactory manner;
3. despite being qualified for and performing her job in a satisfactory manner, she was discharged from employment; and,
4. after her discharge, the job remained available and/or was filled with an individual not in the Charging Party's protected groups.

With regard to the first element of prima facie, the Charging Party was 53 years old during the relevant time period, and she is of Russian national origin. The Respondent does not dispute knowledge of the Charging Party's age, national origin, and sex.

Concerning the second element, the Respondent also does not dispute the Charging Party was qualified for and performing her work in at least a satisfactory manner. As such, we find the second element has been established.

The evidence shows the Charging Party was discharged from employment on June 14, 2019, thus establishing the third element.

Regarding the fourth element, the Respondent stated it has not hired a replacement to fill the Charging Party's position. Therefore, we find the fourth element has been established.

Considering the evidence as a whole, we find a prima facie case of discrimination concerning the issue of discharge, under the basis of age and/or national origin, has been established.

**If the Charging Party has shown a prima facie case, the Respondent's response is analyzed to determine whether its explanation for its actions is non-discriminatory, believable, and business related.**

The Respondent stated on June 14, 2019, it terminated the Charging Party's employment, as part of a Company-wide reduction in force. The Respondent also stated a letter was sent to the Charging Party saying, in part:

> [W]e [Archer-Daniels-Midland Company, The Respondent] unfortunately need to inform you [Larisa Dirkzwager, the Charging Party] today that certain positions, including your current role, are being impacted. Please know that this decision is in no way a reflection of our many talented colleagues and their efforts each and every day; rather, it is a function of the broader changes we are making to the global ADM [Archer-Daniels-Midland Company, the Respondent] organization.

Considering the evidence as a whole, we find the Respondent's reasons for its actions are non-discriminatory, believable, and business related.

**If the Respondent's reason for its actions is found to be credible, the burden then shifts back to the Charging Party to demonstrate that the Respondent's response is pretext to discrimination as alleged.**

In order for the Charging Party to show pretext to discrimination as alleged, the evidence must show that other similarly-situated individuals, not in her protected groups, were preferably treated as compared to her, for reasons related to her age and/or national origin. The evidence does not support this theory.

The Charging Party alleges shortly before she was terminated from employment, the Respondent hired employee Alisha (last name unknown), who is under the age of 30 and not of Russian national origin. The Charging Party also alleges Alisha was doing the same type of work as the Charging Party. According to the Charging Party, Alisha's employment was not terminated.

The Respondent admitted it hired another employee at its location in Velva, North Dakota in or about March 2019. The Respondent stated the new employee was not employed in the same position/level, as the Charging Party. The Charging Party admitted Alisha was hired for a Laboratory Technician I position, whereas the Charging Party was working as a Laboratory Technician III.

The Respondent provided information regarding other employees, who were subjected to the reduction in force, in June 2019. The evidence shows the Respondent terminated 23 employees, including the Charging Party. The evidence also shows out of the 23 employees: 11 employees were under the age of 40; three (3) employees were under the age of 45; one (1) employee was 50 years old; four (4) employees were between the ages of 52 and 55; and four (4) employees were between the ages of 58 and 61. The Respondent stated it does not maintain any information regarding the employee's national origins; however, it is reasonable to assume some, if not most of the terminated employees, were not of the Charging Party's national origin. In addition, there is no evidence which demonstrates the Respondent's policies and/or practices, related to discharge, consider an employee's age and/or national origin.

Considering the evidence as a whole, we find the Charging Party was not discharged from her employment, for reasons related to her age and/or national origin.

**Basis:      Retaliation**
**Issue:      Discharge**

In order to find a violation in the issue of *discharge* under the retaliation provisions of state and/or federal law, the Charging Party must first establish discriminatory motive by direct evidence or a showing of a prima facie case. Because there is no direct evidence or the direct evidence provided in this case is questionable or disputed, the Charging Party must show:

1. that she opposed a practice made unlawful by one of the employment discrimination statutes or that he engaged in a protected activity in that he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, hearing, or litigation under federal, or state laws,
2. that she suffered adverse action by the employer subsequent to or contemporaneous with such protected activity, and
3. that there exists a causal connection between such activity and the employer's action (e.g., there is direct evidence of retaliation or the action followed the protected activity so closely as to justify an inference of retaliatory motive).

For reasons discussed in detail under the issue of *failure to promote,* under the basis of retaliation above, the evidence shows the Charging Party participated in protected activities in May and June 2017. Therefore, we find the first element has been established.

Regarding the second element, the evidence shows the Charging Party was discharged from employment on June 14, 2019, thus establishing the second element.

Concerning the third element, we find the termination of the Charging Party's employment on

18

June 14, 2019, did not follow her participation in protected activities so closely, as to justify an inference of retaliatory motive and the issue fails at the third element.

Even if the Charging Party were able to establish the third element the issue would still fail.

The Respondent stated the Charging Party's employment was terminated as part of a reduction in force. As discussed in detail under the issue of discharge based on age and/or national origin above, the evidence shows the Respondent terminated 23 employees, including the Charging Party, as part of the reduction in force. The Respondent stated no other employee, other than the Charging Party, participated in a protected activity prior to being terminated from employment. In addition, there is no evidence which shows the Respondent's policies and/or practices, concerning discharge, consider whether an employee has participated in a protected activity.

Considering the evidence as a whole, we find the Charging Party was not discharged from her employment, for reasons related to her participation in protected activities.

## VI   CONCLUSIONS

Evaluation of the evidence DOES NOT support the Charging Party's allegations of discrimination, based on her age, national origin, and/or sex. The evidence shows the Charging Party was not subjected to hostile working environment harassment, based on her age, national origin, and/or sex, which is actionable under the applicable statutes. The evidence also shows the Charging Party was not subjected to hostile working environment sexual harassment, which is actionable under the applicable statutes. The evidence demonstrates the Charging Party was not promoted, for reasons unrelated to her age, national origin, and/or sex. The evidence also demonstrates the Charging Party was not promoted, for reasons unrelated to her participation in protected activities. Lastly, the evidence shows the Charging Party was not discharged from her employment, for reasons related to her age, national origin, and/or her participation in protected activities.

## VII   RECOMMENDATION

Therefore, the Department determines that the evidence obtained during the investigation DOES NOT establish violations of the North Dakota Human Rights Act, as amended, the Age Discrimination in Employment Act of 1967, as amended, or Title VII of the Civil Rights Act of 1964, as amended.

Under N.D.C.C. § 14-02.4-19, any person claiming to be aggrieved by any discriminatory practice other than public services or public accommodations in violation of this chapter may file a complaint of discriminatory practice with the Department or may bring an action in the district court in the judicial district in which the unlawful practice is alleged to have been committed, in the district court in which the records relevant to the practice are maintained and administered, or in the district court in which the person would have worked or obtained credit were it not for the alleged discrimination act within three hundred days of the alleged act of wrongdoing. If a complaint of discriminatory practice is first filed with the Department, the period of limitation for bringing an action in the district court is **ninety days** from the date the Department issues a written notice to the complainant that administrative action on the complaint has concluded.

19

As the charge was also filed under a federal act(s) which is (are) enforced by the United States Equal Employment Opportunity Commission (EEOC), the Charging Party has the right to request an EEOC review of this action. To secure a review, the Charging Party must request it in writing, within 15 days of receipt of this letter to:

> Daniel L. Lim
> State and Local Coordinator
> Equal Employment Opportunity Commission
> Chicago District Office
> John C. Kluczynski Federal Building
> 230 S. Dearborn St., Suite 1866
> Chicago, IL 60604
> (312) 872-9669

The North Dakota Department of Labor and Human Rights now concludes its processing of this charge.

Milena Stojkovic
Compliance Investigator

cc: Michael Link, Respondent's Attorney

20

STATE OF NORTH DAKOTA                                    IN DISTRICT COURT

COUNTY OF ____McHenry___                                 __Northeast_____ JUDICIAL DISTRICT

Larisa Dirkzwager_____                      )

(Plaintiff)                                     )        Case No. _____

                                                )

                          PLAINTIFF,            )        ___EXHIBIT_____

Vs                                             )

_Archer-Daniels-Midland Company_____           )        Jury Trial requested_____

(Defendant)                                    )

                          DEFENDANT,           )

### EXHIBIT B

### Charge of Discrimination (EEOC)

#### Parties

**The Plaintiff**

Name                    Larisa Dirkzwager____

Street Address          5869 49th Ave NE____

City and County         York, Benson_____

State and Zip code      North Dakota, 58386

Telephone Number ___763-307-0342____

E-mail Address          ld.quarterhorses@gondtc.com

**The Defendant**

Name                    Archer-Daniels-Midland Company___

Street Address          1388 Highway ND-97_____

City and County         Velva, McHenry_____

State and Zip code      North Dakota, 58790_____

Telephone Number ___701-338-2075_____

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | [X] FEPA | NDE2006135 |
| | | [X] EEOC | 32F-2020-00038 |

| North Dakota Department of Labor and Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Larisa Dirkzwager | (763) 307-0342 | 1966 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5869 49th Ave Ne, York, ND 58386 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| ADM PROCESSING | 15 - 100 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 1388 Highway 97, Velva, ND 58790 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | (701)338-2075 |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest — Latest |

DISCRIMINATION BASED ON (Check appropriate box(es).)

[ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [X] NATIONAL ORIGIN
[X] RETALIATION  [X] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION
[ ] OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest  02-28-2014  Latest  06-14-2019

[X] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Background: I began working for the above-named Respondent on July 7, 2011, as a lab tech. Beginning in or about February 2014, and continuing till the end of my employment in June 2019, I was subjected to continual harassment based on my nation origin (Russian) by coworkers who made continual comments about "me being Russian in relation to current events, such as, the 2014 Russian conflict in the Crimea Peninsula, 2016 United States Presidential elections, and the 2017 Russian doping scandal at the Olympics.

Also, during my employment, I was subjected to sexual harassment/harassment based on my sex (female) when coworkers would use words with double-meanings, such as "Larisa wants someone to take care of her jugs, any volunteers?", "who wants to take care of Larisa's jugs?", these comments continued until my discharge in June 2019.

I reported that I was being harassed continually to the Respondent, beginning in, May 2017, and throughout

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 02-26-2020   *Larisa Dirkzwager*  Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| **X** FEPA | **NDE2006135** |
| **X** EEOC | **32F-2020-00038** |

### North Dakota Department of Labor and Human Rights                    and EEOC

*State or local Agency, if any*

throughout my employment.

In December 2018, I applied for the position of yard supervisor. In April 2019, I was told I did not receive the promotion. I believe I was not selected for the promotion due to my national origin, sex, age (53), and/or in retaliation to my complaints of harassment.

On or about, June 14, 2019, I was discharged from employment. I believe I was discharged in retaliation to me reporting harassment.

Personal Harm: I was subjected to hostile working environment harassment based on my national origin and sex. I was subjected to hostile working environment sexual harassment. I was not promoted due to national origin, sex, age, and/or in retaliation. I was discharged from employment in retaliation.

Discrimination Statement:  I believe I have been discriminated against in violation of the North Dakota Human Rights Act (N.D.C.C. ch 14-02.4), as amended, the Age Discrimination in Employment Act of 1967, as amended, and Title VII of the Civil Rights Act of 1964, as amended.

---

I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

02-26-2020 *Larisa Dirkjwager*
Date                    Charging Party Signature

NOTARY – *When necessary for State and Local Agency Requirements*

*Larisa Dirkjwager*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

CP Enclosure with EEOC Form 5 (11/09)

PRIVACY ACT STATEMENT: Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. FORM NUMBER/TITLE/DATE. EEOC Form 5, Charge of Discrimination (11/09).

2. AUTHORITY. 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. PRINCIPAL PURPOSES. The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. ROUTINE USES. This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION. Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.